Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★ ★ ★ ★ ★ ★

**MEMORANDUM OPINION**

No. 04-08-00522-CV

In the **INTEREST OF V.G.**, E.G., A.G., J.G., JA.G.

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-PA-02435
Honorable Peter Sakai, Judge Presiding

Opinion by:    Steven C. Hilbig, Justice

Sitting:        Catherine Stone, Chief Justice
                Sandee Bryan Marion, Justice
                Steven C. Hilbig, Justice

Delivered and Filed: August 31, 2009

AFFIRMED

      This is an appeal from a trial court's order terminating Victor's and Maricruz's parental rights to their five children ("the children").[1] We affirm the trial court's judgment.

### PROCEDURAL BACKGROUND

      The Texas Department of Protective and Regulatory Services removed V.G., E.G., J.G., JA.G., and A.G. from their home in November 2006. The Department ultimately sought to terminate the parents' rights to all of the children. At the conclusion of the trial, the trial court agreed termination was the proper result and entered an order terminating the parental rights of both Victor

---

[1] On May 26, 2009, this court received a notice from Victor, advising A.G. died.

and Maricruz. Victor and Maricruz filed separate motions for new trial and statements of appellate points. The trial court denied the motions for new trial, but found their appellate points were not frivolous. *See* TEX. FAM. CODE ANN. § 263.405(d) (Vernon 2008). Victor and Maricruz filed individual notices of appeal and have filed independent appellate briefs challenging the termination. Maricruz and Victor contend the evidence is legally and factually insufficient to support the trial court's determination that termination was in the children's best interest, and the trial court erred in refusing to allow two of the children to testify. Victor raises three additional contentions, claiming the evidence did not support the trial court's finding that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, ineffective assistance of counsel, and section 263.405(i) of the Texas Family Code is unconstitutional.

## ANALYSIS

Parental rights can be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code, and (2) termination is in the best interest of the children. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); TEX. FAM. CODE ANN. § 161.001(1), (2) (Vernon 2008). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *J.O.A.*, 283 S.W.3d at 344 (quoting TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002)).

### *Legal and Factual Sufficiency*

*Standard of Review*

When the legal sufficiency of the evidence is challenged in a case where the burden of proof is by clear and convincing evidence, the reviewing court must look at all of the evidence in the light most favorable to the finding in question to determine "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. Looking at the evidence in the light most favorable to the finding means the court "must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* The court must also disregard all evidence a reasonable factfinder could have found incredible. *Id.* However, the reviewing court should not disregard undisputed facts that do not support the finding because doing so "could skew the analysis of whether there is clear and convincing evidence." *Id.* After conducting this review, if the court determines no reasonable factfinder could have formed a firm belief that the matter in question is true, it must conclude the evidence is legally insufficient. *Id.*

When the factual sufficiency of the evidence is challenged in a clear and convincing case, the reviewing court must look at all of the evidence and, "[i]f, in the light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* If the reviewing court finds the evidence factually insufficient, it should explain "why it has concluded that a reasonable factfinder could not have credited the disputed evidence in favor of the finding." *Id.* at 267.

*Best Interests*

A trial court has great discretion in determining the best interests of a child. *Villasenor v. Villasenor*, 911 S.W.2d 411, 419 (Tex. App.—San Antonio 1995, no writ). "There are several factors that should be taken into account when determining whether termination is in the best interest of the child." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). These include factors set forth in section 263.307 of the Family Code that are relevant in the particular case.[2] *See id.*; *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.). Courts should also employ the non-exhaustive list of factors developed by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), to determine a child's best interests. *Id.* These include: (1) the child's desires, (2) the emotional and physical needs of the child, now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of those seeking custody, (5) the programs available to assist individuals seeking custody to promote the child's best interest, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parents, which may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. *Id.* These are commonly referred to as "the *Holley* factors." *See, e.g.*, *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.); *In re S.N.*, 272 S.W.3d 45, (Tex. App.—Waco

---

[2] The factors relevant in this case include: (1) the children's ages and physical and mental vulnerabilities, (2) the magnitude, frequency, and circumstances of the harm to the children, (3) whether the children have been the victims of repeated harm after an initial report and intervention, (4) whether the children are afraid to return home, (5) the results of testing or evaluations of the children and parents, (6) whether the perpetrator of the harm had been identified, (7) the willingness of the parents to seek out, accept, and complete counseling and cooperate with supervising agencies, (8) the willingness and ability of the family to effect positive environmental and personal changes within a reasonable time, and (9) demonstration of adequate parenting skills, including providing the children with adequate health and nutritional care, care and nurturance consistent with the children's development, and understanding the children's needs. *See* TEX. FAM. CODE ANN. § 263.307(b)(1), (3), (4), (5), (6), (9), (10), (11), (12) (Vernon 2008).

2008, no pet.). No single factor is controlling, and the factfinder is not required to consider all of them. *Holley*, 544 S.W.2d at 372. "The absence of evidence about some of these consideration would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest." *C.H.*, 89 S.W.3d at 27. And, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *Id.* The *Holley* factors overlap with some of the statutory considerations set forth in section 263.307 and with evidence supporting predicate grounds for termination. *In re K.C.*, 219 S.W.3d 925, 928 (Tex. App.—Dallas 2007, no pet.).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *A.B.*, 269 S.W.3d at 126. However, courts should indulge the strong presumption that the child's best interests will be served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

*Section 161.001(1)(D) of Texas Family Code*

Section 161.001 allows termination of parental rights if there is clear and convincing evidence that termination is in the child's best interest and a parent knowingly placed or knowingly allowed a child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(1)(D), (2) (Vernon 2008). Endangerment means to expose to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Although the focus of section 161.001(1)(D) is on a child's living environment and not on the parent's conduct, parental conduct may produce an endangering "environment." *J.T.G.*, 121 S.W.3d at 125; *see In re D.T.*, 34 S.W.3d , 625, 633 (Tex. App.—Fort

Worth 2000, pet. denied). Under section 161.001(1)(D), a single act or omission will support parental termination. *In re L.C.*, 145 S.W.3d 790, 796 (Tex. App.—Texarkana 2004, no pet.).

*The Evidence*

The Department called nine witnesses: two doctors, five licensed counselors or therapists, one social worker, and the Department supervisor overseeing the case. Maricruz and Victor testified on their own behalf, and called a counselor who saw them just before the trial began.

The first Department witness was Dr. Jane Lynch, a board-certified pediatrician and pediatric endocrinologist who evaluated J.G. Dr. Lynch testified J.G. was referred to her in August 2005 by J.G.'s pediatrician because of "short stature." When Dr. Lynch first saw J.G. he had the height of a three and one half-year-old child and the weight of a three-year-old child, but he was seven and one-half years old. Maricruz attributed J.G.'s small stature to his premature birth. Upon testing, Dr. Lynch discovered J.G. was producing almost no growth hormone, and his growth hormone level was the lowest she had ever seen. She also noted delayed bone growth and opined J.G. had not been growing for some time. After conducting many tests, which failed to reveal an organic cause for J.G.'s problem, and based in part on Maricruz's statements that J.G. was "well cared for," ate well, and had a good appetite, Dr. Lynch diagnosed J.G. with "growth hormone deficiency." She prescribed growth hormone replacement therapy. Dr. Lynch testified that after this initial visit, she did not see J.G. for an entire year. His parents failed to obtain his growth hormone in a timely manner, failed to refill the prescription as required, and failed to meet with a neurologist to which he had been referred until Dr. Lynch's office intervened. She stated that in October 2006, she was contacted by the Department and was advised there were concerns J.G. was not growing because of "issues with feeding and concerns for some abuse in the home." The Department asked if she could

see J.G. the next day, and she agreed.  Wanting to give Maricruz and Victor the benefit of the doubt, she closely questioned them about J.G.  After a more extensive evaluation, Dr. Lynch stated she confronted Maricruz and told her about the call from the Department.  Maricruz denied she starved or otherwise abused J.G.  Maricruz also claimed J.G. seemed to like the attention he received because of his small size and he was "probably just seeking attention" as he had done before.  In response to Dr. Lynch's questions, Maricruz denied there were times when J.G. received less than a full plate of food, denied any concerns about how she fed J.G., and claimed there was nothing that would make her want to feed him differently.

During this same visit, Dr. Lynch placed J.G. in a separate room.  As it was lunch time, the staff offered J.G. something to eat, which he declined at first, but then accepted.  While eating some cake, J.G. heard Maricruz's voice and became so upset Dr. Lynch considered sedating him.  According to Dr. Lynch, J.G. "literally went under the chair saying over and over again, 'She knows, she knows, she knows.  She knows I ate.  She is going to know I ate.  She always knows when I eat. I should have never had anything to eat today.  I – I shouldn't have eaten.'"  Dr. Lynch decided J.G. needed hospitalization, and after further investigation, discussions with the Department, as well as J.G.'s reaction after eating in her office, she changed her original diagnosis to psychosocial dwarfism, type two.

Dr. Lynch testified psychosocial dwarfism occurs when a child experiences severe emotional abuse, which causes the hypothalamus to stop sending messages to the pituitary gland to produce and secrete growth hormone.  Psychosocial dwarfism, type two, begins around age three, is most common in males, and the abusive environment literally causes the child to stop growing.  She said J.G.'s case was one of the most severe of the seven or eight cases she has seen of this rare condition.

Almost immediately after J.G. was removed from his parents and the growth hormone therapy halted, his growth hormone production went from almost zero to normal and he gained weight. Dr. Lynch described his growth as "remarkable," "incredible," "astronomical." From ages three to eight, J.G. had no linear growth and no weight gain. After removal from the home, and by age ten, J.G. had the height of an eight and one-half year old and the weight of a nine and one-half year old. In little more than a year, he had a four-year growth spurt and his bones had matured. He grew more than eight inches and gained twenty-two pounds. She testified J.G.'s immediate production of growth hormone and incredible weight gain and growth after being removed from his parents confirmed her diagnosis of psychosocial dwarfism because if anything other than psychosocial dwarfism had caused the failure to produce growth hormone, e.g., tumors, pituitary issues, or trauma, the failure to produce growth hormone would not be reversed.

Though she admitted Maricruz and Victor seemed genuinely concerned about J.G., were cooperative when she told them he was going to be hospitalized, and attended every subsequent medical meeting, Dr. Lynch testified that if J.G. were sent back home, he would revert back to producing no growth hormone. Dr. Lynch was very concerned about returning J.G. to his parents given that Victor asked her if J.G. was "fixed" and questioned why he had not grown in the first place though Dr. Lynch had been very clear that J.G.'s condition resulted from an abusive and stressful home environment. Dr. Lynch stated psychosocial dwarfism "goes with significant psychopathology with a parent and a child that statistically doesn't reverse," and psychosocial dwarfism is typically not amenable to improvement even with intervention.

Dr. Lynch opined J.G. was under "very severe" stress at home and his home situation was dangerous. While he probably would not have starved to death because he was able to eat at school,

he was in a "very, very traumatic" situation from the time he was three-years-old – the age at which he stopped growing. Dr. Lynch stated the outcome for children with psychosocial dwarfism "is not good, even in the best of cases," noting such children have severe behavioral issues, intelligence issues, bowel and bladder disorders, depression, bizarre food hoarding, and eating disorders. Children with psychosocial dwarfism have a fairly poor prognosis and do not grow up to be normal children.

When asked about the effect of J.G.'s condition on his siblings, Dr. Lynch opined they participated "in what has gone on in the last several years with [J.G.]." She stated it would be very traumatic for them to return home and believed they were perhaps coerced to lie to Department workers and medical professionals. Dr. Lynch believed J.G.'s siblings witnessed and were requested to participate in "some pretty cruel physical abuse." The parents apparently asked the other siblings to report on J.G., including whether he had eaten anything during the school day. She also worried the abuse that resulted in J.G.'s psychosocial dwarfism might happen to one of the other children. Dr. Lynch also noted Maricruz lied about the condition of another one of her children, A.G., telling Dr. Lynch initially all four of her other children were fine. Dr. Lynch subsequently learned A.G. suffered from "mutism and severe developmental delay and seizures." Other evidence showed A.G. was fine until age two when he suffered a near drowning for which his parents failed to seek medical attention. However, the parents claimed A.G. suffered from seizures as early as four months of age and they became worse after a hospital visit at which he was improperly medicated.

Through cross-examination, Maricruz and Victor attempted to show J.G.'s condition was not the result of psychosocial dwarfism, but rather he suffered from stomach issues. They contended J.G. was given less food because when he ate more he would become ill. However, Dr. Lynch stated

that when she asked the parents about this contention they denied it, and Maricruz told her during the first medical appointment J.G. ate three meals and one or two snacks a day. Even on the second visit after Dr. Lynch told Maricruz about the information she had from the Department about J.G. and his feeding issues, Maricruz never mentioned any food restrictions, and stated J.G. "eats a lot," was very active, and ate as much as his four brothers. Dr. Lynch rejected the suggestion by the parents that J.G.'s short stature and low weight was caused by something other than psychosocial dwarfism, including his premature birth. She also rejected the suggestion the parents were too uneducated to have understood what was happening to J.G.. Dr. Lynch testified a Lubbock physician, who saw J.G. years before, clearly told the parents J.G. required additional testing, but the parents never acted on the medical instructions.

The Department also called Dr. Jim Anderst, a child abuse pediatrician who examined and interviewed J.G. in November 2006 and May 2007 after J.G. had been removed from his parents' home. When Dr. Anderst first met with J.G., the child was only partially forthcoming because Maricruz told him not to tell the truth about their relationship. Later, J.G. admitted Maricruz made fun of him and kicked him during a visitation. J.G. also told Dr. Anderst he was fed differently from the other children and had to eat in the bathroom. J.G. admitted missing his father, but not his mother. Dr. Anderst had no doubt J.G. suffered from intentional neglect and abuse at the hands of his parents. He could not explain why J.G. was singled out for abuse.

Dr. Anderst agreed J.G.'s condition was most consistent with psychosocial dwarfism. He stated the condition was caused by J.G.'s "disordered" relationship with Maricruz. He testified J.G. was a "victim of psychological and emotional abuse and neglect." Citing J.G.'s claim that he could only eat in certain places and in certain amounts, Dr. Anderst, testified J.G. had an abnormal

relationship with his family and was treated differently than the other children. Dr. Anderst stated the type of abuse suffered by J.G. is relatively rare, but has an enormous effect, and the long-term outcome of this type of abuse is "much worse" than physical abuse because it is prolonged and premeditated.

Dr. Anderst also examined and interviewed V.G., E.G., and Ja.G., and spoke with Maricruz and Victor. He stated it was "very clear" the siblings were not truthful during the interview. They knew he had spoken to school personnel about the family, and the personnel had told the doctor the siblings confirmed the abuse and neglect of J.G. However, the children denied telling anyone about the abuse. This fact coupled with J.G.'s statement that he was not to tell the truth led Dr. Anderst to believe the siblings were not telling the truth during the interview. Moreover, Dr. Anderst stated E.G., and Ja.G., and especially V.G. "seemed to be involved in the abuse and neglect," and were "part of the entire interaction that was negative toward [J.G.]." This created a "disordered" relationship between the brothers and J.G.. He testified it was clear V.G., the oldest child, was "involved in emotional abuse of [J.G.]," and had a history of making fun of J.G. because of his size. Dr. Anderst stated that while the children were in his clinic, V.G. ran around trying to listen to what his brothers were saying in their interviews. The doctor believed V.G. "was in charge of making sure the other children conformed to the parent's [sic] rules." Dr. Anderst said the siblings' prognosis to become emotionally healthy adults had been compromised by their involvement in the abuse, and it would affect them in their future relationships.

Dr. Anderst could not recommend returning siblings of an abused child to the abusers unless the abusers admit fault, seek and complete treatment, and demonstrate behavioral change. Dr. Anderst also testified returning the siblings in this case would not be appropriate unless their parents

recognized their behavior caused J.G.'s problems. He expressed concern that Maricruz did not perceive the effect her treatment of J.G. had on J.G. or the other children given she denied knowing what was wrong with J.G., claiming he was fed just like the other children. He testified that until the parents achieved recognition of their responsibility for J.G.'s problems, the siblings would be at risk if they were returned because they could suffer the same type of abuse. Dr. Anderst, as Dr. Lynch, believed the parents hid information from him because their stories did not match information he received from the Department or from J.G..

On cross-examination, Dr. Anderst denied the parents' suggestion a hernia could cause psychosocial dwarfism, and denied prematurity could affect J.G.'s growth to the degree and duration demonstrated by the facts of this case.

In addition to the testimony from the doctors, the Department presented evidence from the counselors and a social worker who worked with the family after the children were removed. They included the parents' counselors, the children's counselor, J.G.'s social worker and counselor, and a family counselor. The parents' counselors and the family counselor testified that during therapy the parents made some progress in the areas of communication with each other, resolution of marital issues, and admissions of missed medical appointments. However, the parents never made any significant progress in the area of accepting responsibility for the abuse of J.G. or regarding the general safety of the children. More specifically and despite the medical evidence to the contrary, they never took responsibility for any intentional abuse or denying J.G. food, always blaming undiagnosed stomach issues or blaming J.G. for overeating and forcing them to limit his food intake. According to the counselors, both parents would, at times, acknowledge and accept some responsibility for the abuse, but then would revert back to their original claims that J.G. had stomach

issues, or they limited J.G.'s food intake based on doctors' orders, or the children were removed simply because Maricruz missed medical appointments. The counselors contended that without acceptance of responsibility for the abuse to J.G. and his siblings, the prognosis for the family was poor. Several counselors terminated therapy with the parents because they would never truly accept responsibility for their treatment of the children and the resulting harm.

Each counselor believed Maricruz and Victor loved their children, but opined it would be unsafe and not in the children's best interests to return J.G. or his siblings to the parents. At one point during therapy, the children confronted the parents about the abuse. Maricruz apologized to the children, and several counselors acknowledged this was a good step in the process, but problems persisted. One therapist described Maricruz as defensive and uncomfortable during the confrontation, and Victor's response was described as detrimental. Victor was angry and told J.G. he needed to go to church and pray because he was acting rebellious. He also kept telling J.G. to "shut up, shut up, be quiet, that's in the past." During his testimony, Victor claimed he did not remember telling J.G. to "shut up."

Even after a second apology by Maricruz, one of the counselors opined it was merely an attempt to manipulate the children and the counselors. Another counselor stated he believed Maricruz apologized only because she finally understood she might lose her children, and yet another stated the apology was not the "full apology" Maricruz had discussed and intended to give. Several counselors agreed that after the positive step, the parents reverted back to their prior behavior and attitudes.

In addition to the parents' counselors, the trial court heard testimony from Julie Strentzsch, the counselor for V.G., E.G., and Ja.G. She stated that even though J.G. bore the brunt of the abuse,

the other children would struggle with these events for the rest of their lives, and would require continued therapy. In her opinion, any therapeutic progress would be lost if they were returned home. Ms. Strentzsch testified that if the children, including J.G., were sent home, they would keep the trauma inside and it would come out in other ways, such as lashing out at others at school, fighting, hurting others, or ending in the juvenile delinquency system. She noted V.G. and Ja.G. had already shown signs of aggression. Sending them home without J.G. would not be safe because generally when abuse is focused on one child and that child is removed, the focus of the abuse will shift to another child, putting that child in jeopardy. She believed such was a possibility in this case.

Ms. Strentzsch testified V.G., who was twelve-years-old when she counseled him, had been "parentified" with regard to the other siblings, explaining V.G. felt responsible for them as if he were a parent. V.G. also made statements about abuse he suffered at the hands of his parents, but he told Ms. Strentzsch he was not going to talk about it. Eventually, V.G. admitted to her Maricruz had not fed or taken care of J.G.. He cried and said he felt responsible and did not know what to do. Ms. Strentzsch said V.G. would struggle with that guilt for the rest of his life. She also believed V.G. knew far more than what he eventually shared with her. In her opinion, his parents were trying to buy his silence given how his parents seemed to favor him over the other children. They secretly gave him a cell phone during a visitation, which she believed was done so the parents could talk to him and influence what he might say. This surreptitious behavior by the parents further endangered V.G.'s psychological condition.

The Department also presented testimony from Leslie Switzer, the social worker who provided individual therapy to J.G.. Ms. Switzer observed J.G. hoarding food and eating with his hands because he could not use a fork. J.G. told her about the abuse he suffered. He told her his

mother did not feed him, starved him, and if he ate anything she would hit or kick him in the stomach until he threw up. J.G. said he was afraid to eat at school because when he came home his mother would ask if he had eaten at school and would know if he lied. J.G. said his mother told him to lie about not being fed. He also told her he did not have a bed to sleep in, but was made to sleep on a pallet next to his mother's bed. He said all the other children had beds. J.G. was angry at Victor for not protecting him and for not making Maricruz feed him. Ms. Switzer testified she did not think J.G. was lying because he told her he would take back everything he said if he could go home, and he believed his mother had learned a lesson and would not hurt him anymore. She stated she believed J.G. was abused and neglected by his parents, and unless they made significant progress in therapy, J.G. would be in "great danger" if he returned home. She, like the other children's therapist, also feared for the safety of the other children if they were returned home without J.G., stating another child might become the focus of the abuse.

Ada Gomez, the Department's case supervisor, advised the trial court of the family's extensive history with the Department, dating back to 1998. She stated the records showed a definite pattern of abuse. There were fifteen reports, and thirteen of those related to J.G. Ms. Gomez said the family was offered "family-based safety services" four times before the Department removed the children in 2006.

Ms. Gomez also provided information about A.G.[3] According to Department records, when the Department investigated the family in 2001, A.G. was a healthy child who was developmentally on target. At the time of trial, A.G. was seriously mentally disabled and unable to speak. The children stated A.G. nearly drowned and this caused his disability. However, the parents claimed

---

[3] This is the child who passed away after the appeal was filed.

A.G. had seizures as early as four months of age, which became worse after a hospital medication incident. The Department was unable to obtain medical records to confirm the parents' claim.

Ms. Gomez agreed termination was the best result for all of the children, noting the parents had been in therapy for eighteen months and had shown no real progress on critical issues. She testified the parents should not be given more time to work on these issues because the children are young and adoptable, though no family has yet come forward and requested to adopt any of the children.

At different times and to various people, all four children expressed desires to return home. However, J.G.'s wish to return home was limited to returning to his father, without the presence of his mother. When he talked about returning home, he worried about who would watch him and what would happen to his mother if she mistreated him again. He was afraid of his mother and feared if he went home he would die. During the trial, J.G. attempted to run away from his foster home. When questioned by his foster father, Tony Roehr, J.G. said he ran away because he was afraid the court would send him back to his parents and his mother would hurt him again.

Initially, neither Ja.G. nor E.G. wanted to return home. Ja.G. told Ms. Strentzsch there were "scary people" at home. However, the family therapist, Pedro Gonzalez, described Ja.G. as "oblivious" due to his age. V.G., despite his desire to return home, told Ms. Strentzsch he liked his new school and teachers and felt safe there. He told her he wants to remain there "no matter what happens."

Maricruz and Victor testified. When asked by her attorney why she was in court, Maricruz stated she was in court because of "neglect" – she did not feed J.G. "enough" and missed medical appointments. She said she was sorry she did not take J.G. to the doctor and claimed to understand

he was starved and abused, but reiterated she "didn't do it on purpose." She denied intentionally failing to feed J.G., and refused to admit she failed to feed him. Maricruz claimed her biggest mistake was not having the necessary paperwork to show J.G.'s hernia was the cause of his problems. She admitted there was physical and mental abuse "to a point." Maricruz admitted J.G. was afraid of her, but it was because he believed she got upset when he ate too much and threw up. She testified she sometimes did not give J.G. the same amount of food as the other children because he would eat too much and throw up. Admittedly she treated J.G. differently, but blamed J.G., stating it was "[b]ecause of his problem" – she "always had to watch him about food" because he would attempt to take more food than the other children.

Maricruz testified she completed all the parenting classes and attended every scheduled counseling session. She felt she had made progress, it simply took her some time to understand the problem. She also claimed conflict with all of the therapists. She stated she felt bad about what she did, and she did not "try hard enough." Maricruz said when the children confronted her at the October visitation, it opened her eyes. She described apologizing to the children, but claimed J.G. did not want to listen; however, she quickly stated J.G. hugged her and forgave her. She noted the other children understood and had a good response. Maricruz generally admitted what happened was her fault alone, but she felt overwhelmed. With regard to the family's previous referrals to the Department, Maricruz claimed she did everything the Department asked her to do and denied she failed to accept or complete services. Despite Department records, she claimed she could not remember being offered her services four times.

Victor testified he spent his time working and was unaware of any problems with J.G. or the other children. He was busy being a "good provider," and Maricruz took care of most matters

involving the children. However, by his own admission, he was usually home by 6:30 p.m. every day. Victor claimed they did not feed J.G. more because he would "get a big stomach and he would have problems," and stated J.G. "struggled" with his eating habits. Victor admitted he felt bad when a counselor told him J.G. was not being fed, but claimed he did not believe Maricruz intentionally starved J.G., stating his wife "was a good Mom." Victor testified he was "all confused," but still did not believe J.G. was starved, contending he had medical problems. He said neither he nor Maricruz was responsible for J.G.'s failure to produce growth hormone. Victor felt if he had put more pressure on J.G.'s doctors to find out what was wrong with him when he was younger, the children would not have been removed.

Victor testified therapy had helped him. He told the court he has cut back on his work hours. He stated he has completed all services and therapies requested by the Department, and stated he would do more if necessary. However, he admitted to missing two or three appointments with one of the counselors, who he claimed never believed him or understood him. He told the court he was continuing his therapy without Department intervention with a new counselor. Victor admitted he and Maricruz did things wrong, including not realizing what J.G. was going through.

Victor and Maricruz also called one of their counselors to testify. Trisha Boone testified she had met with the parents for only three sessions because of the impending trial. She stated both were cooperative, seemingly willing to work on their issues, and appeared truthful. Ms. Boone believed if she had more time with the parents, it would have made a difference, and she considered Maricruz's apology a good first step. However, on cross-examination Ms. Boone admitted the parents had never told her J.G. was diagnosed with psychosocial dwarfism, and failed to disclose any of the physical or emotional abuse previously admitted in another therapy session. The parents told

her about Dr. Lynch, but simply claimed J.G. had a growth hormone problem and had an appetite that was more than they could handle. Victor claimed he did not notice J.G.'s small size because he was a premature baby and was always small.

Ms. Boone testified the undisclosed information was important, and if true, the family would need a high level of involvement to achieve reunification. She also admitted she could not dispute any of the other counselors' opinions after just three sessions, would be concerned if the other counselors believe the parents were dishonest, and advised that under the circumstances there would be no guarantee of reunification even if the parents were given extreme therapy.

Finally, the children's ad litem provided a verbal report to the court. She admitted V.G., E.G., and J.G., all desired to return home. According to her, Ja.G. could not articulate a choice because of his age. However, she believed it would be unsafe for the children to return home, and in light of the counselors' testimony she could not recommend reunification. She stated the parents' trial testimony fully demonstrated their lack of "self-realization," and they did not really recognize the existence of any abuse or neglect. She told the court she was opposed to any further delay given eighteen months had passed since removal and the parents had not demonstrated any real change in their attitudes. The ad litem expressed hope for adoption.

In light of the evidence detailed above, we hold the evidence was legally and factually sufficient to support the trial court's findings. A reasonable factfinder could have formed a firm belief or conviction that termination of Maricruz's and Victors' parental rights was in the children's best interest. A reasonable factfinder could have also formed a firm belief or conviction that Victor knowingly placed or knowingly allowed his children to remain in conditions or surroundings that

endangered their physical or emotional well-being. Accordingly, we overrule Maricruz's first issue and Victor's first and second issues.

### *Exclusion of Testimony*

Maricruz and Victor contend the trial court erred in refusing to allow V.G. and E.G. to testify and such error was harmful. According to Maricruz's trial counsel, subpoenas were issued to procure the testimony of V.G. and E.G. However, the children were not brought to court and the trial court ultimately denied Maricruz's requests to have the children testify in court or in chambers. By way of proffer, Maricruz stated that if the children had been permitted to testify, they would have expressed their desire to return to their parents, and would have testified to the changes they have seen in their parents with regard to their attitudes toward and care of the children. V.G. would have also allegedly testified whether he believed his parents would "hurt him or his siblings in the future." Assuming without deciding that this was a sufficient offer of proof to preserve the alleged error for our review, *see* TEX. R. EVID. 103(a)(2), we find no error.

The admission or exclusion of evidence is within the trial court's discretion, and we will not disturb the trial court's ruling absent an abuse of that discretion. *In re J.F.C.*, 96 S.W.3d 256, 285 (Tex. 2002); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). "A trial court abuses its discretion when it acts without regard for any guiding rules or principles." *Alvarad*o, 897 S.W.2d at 754. The paramount or overriding principle guiding courts in termination cases, as in all cases involving the parent-child relationship, is the best interest of the child. *See In re D.M.*, 244 S.W.3d 397, (Tex. App.—Waco 2007, no pet.); *In re S.P.*, 168 S.W.3d 197, 211 (Tex. App.—Dallas 2005, no pet.); *see also* TEX. FAM. CODE ANN. § 153.002 (Vernon 2008).

The testimony that would have allegedly been given by V.G. and E.G. was essentially the same as testimony offered by other witnesses. Numerous witnesses testified the children, including V.G. and E.G., wanted to return home. Also, there was testimony from other witnesses who testified the children accepted Maricruz's apology, and testimony J.G. forgave his mother, believing she had changed and would not abuse him any more. In contrast, expert witnesses presented by the Department testified Maricruz and Victor ultimately refused to accept responsibility for their actions. Those witnesses also testified the children should not be returned home because in the opinions of the experts, there had been no significant change and the children would be in danger if returned.

Moreover, Ms. Strentzsch, the counselor for V.G. and E.G., testified she was opposed to either child testifying in court. She stated it would be "less traumatic" if they were to simply speak to the trial judge, but emphasized even that would be traumatic. She also stated it would be psychologically harmful for V.G. to testify because it placed him in a "bind" due to the fact he had been "parentified," i.e., he has become the parent of his younger siblings. Ms. Strentzsch explained that if V.G. were to testify that he and his siblings should be returned to their parents and "something bad were to happen in the future," he would feel responsible. On the other hand, if he testified that neither he nor his siblings should be returned, he would be disloyal to his parents and ultimately responsible for the break up of the family.

We hold the trial court did not abuse its discretion in refusing to allow V.G. and E.G. to testify. Accordingly, we overrule Maricruz's second issue and Victor's fifth issue.

### *Ineffective Assistance of Counsel*

In his third issue, Victor contends his rights should not have been terminated because his trial counsel was ineffective. By statute, indigent parents contesting the termination of their parental rights are entitled to appointed counsel. TEX. FAM. CODE ANN. § 107.103(a)(1)(Vernon 2008). This "statutory right to counsel in parent-rights termination cases embodies the right to effective counsel." *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). Indigent parents with statutorily appointed counsel are entitled to effective assistance, and if counsel is not effective a parent may raise ineffective assistance of counsel in contesting a termination order. *See In re J.O.A.*, 283 S.W.3d 336, 341, (Tex. 2009); *M.S.*, 115 S.W.3d at 544.

Victor was appointed counsel soon after the children were removed from the home. However, Victor decided to retain counsel in lieu of the attorney appointed by the court. Victor testified he hired and paid Gabriel C. Ogueri, an attorney from Dallas who had previously represented him in another matter, to represent him in the instant case. Because Victor had retained counsel rather than counsel appointed pursuant to the Family Code, we hold he is not entitled to raise ineffective assistance of counsel. *See id.*; *see also Martin v. Martin*, No. 04-04-00828-CV, 2005 WL 1552763, *1 (Tex. App.—San Antonio Jul. 6, 2005, no pet.) (mem. op.) (holding no claim for ineffective assistance of counsel lies in civil case where counsel is retained).

Even if Victor could challenge the effectiveness of his retained counsel, we hold he has not sustained his burden under *Strickland v. Washington*. *See* 466 U.S. 668 (1984); *see also M.S.*, 115 S.W.3d at 545 (holding two-pronged *Strickland* analysis applies to claims of ineffective assistance of counsel in termination cases). To establish ineffective assistance of counsel under *Strickland*, the complaining parent must show by a preponderance of the evidence his counsel's performance was

deficient and the deficient performance deprived the parent of a fair trial. *M.S.*, 115 S.W.3d at 545 (citing *Strickland*, 466 U.S. at 688); *Dewberry v. State*, 4 S.W.3d 735, 757 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). As to the deficiency prong, we presume counsel's action fell within the range of reasonable and professional assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). To overcome this presumption, allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999). There is a strong presumption counsel's actions and decisions are motivated by sound trial strategy. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). When the record is silent as to counsel's strategy, we cannot simply speculate his performance was deficient. *Badillo v. State*, 255 S.W.3d 125, 129 (Tex. App.—San Antonio 2008, no pet.); *Stults v. State*, 23 S.W.3d 198, 209 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). If the record is silent as to counsel's strategy, the presumption of effectiveness is sufficient to deny relief. *See Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003). Counsel's performance will be sufficient if any strategic motive can be envisioned and will be considered deficient only if "the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). The standard for reviewing trial counsel's performance "has never been interpreted to mean that the accused is entitled to errorless or perfect counsel." *Ex Parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).

Victor claims his retained trial counsel was ineffective in failing to obtain and review J.G.'s medical records, arguing the entire case centered on whether J.G. had psychosocial dwarfism or some medical condition that caused his failure to produce growth hormone. Victor also claims his

counsel was deficient for failing to object to testimony from several state witnesses about whether the parents had been truthful with medical and therapeutic professionals or attained the goals established for them by the Department.

Despite a hearing on Victor's motion for new trial, he failed to show the medical records even exist, much less that they support his claim. There is also nothing in the record to establish counsel's strategy for failing to object to testimony regarding the parents' honesty and failure to meet established goals. Counsel certainly elicited from Victor that Victor had been honest, fully participated in all Department services, and believed he had changed as a result of his time in therapy. Clearly, counsel understood the importance of these issues and addressed them.

Moreover, with regard to both claims, trial counsel was never afforded an opportunity to explain his decisions. Without such explanation, we would be forced to speculate as to his reasoning. Because Victor's allegations about ineffectiveness are not firmly founded in the record and the record does not affirmatively demonstrate ineffectiveness, he has failed to meet his burden under *Strickland*. *See Thompson*, 9 S.W.3d at 814; *Badillo*, 255 S.W.3d at 129. Accordingly, we overrule Victor's third issue.

### *Unconstitutionality of Section 263.405(i) of the Texas Family Code*

Victor contends section 263.405(i) of the Texas Family Code, which requires appealing parties in termination cases to file a statement of appellate points within fifteen days of the date of the termination order, is unconstitutional because it denies him equal protection of the law, due process of law, and violates the separation of powers clause. His stated appellate issue appears to be an "as applied" challenge to section 263.405(i). However, within the argument, Victor does not even suggest section 263.405(i) was unconstitutional as applied to him; he simply argues that unlike

other civil litigants, appellants in termination cases are faced with the difficult task of formulating and setting forth their appellate issues within an impossible time frame. Despite this and because of the fundamental constitutional rights involved, we will review Victor's issue as both a facial and an "as applied" challenge. *See Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985) (describing parent-child relationship as constitutionally protected natural right "far more precious than property rights.").

A court presumes a statute's validity when examining its constitutionality. *See Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex. 2003); *Gen. Servs. Comm'n v. Little-Tex Insulation Co., Inc.,* 39 S.W.3d 591, 598 (Tex. 2001). The party challenging the statute has the burden to establish the statute is unconstitutional. *See id.* When possible, we are to uphold the statute and "interpret legislative enactments in a manner to avoid constitutional infirmities." *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex. 1996); *see also Little-Tex,* 39 S.W.3d at 598.

"'[A] facial challenge to a statute is the most difficult challenge to mount successfully because the challenger must establish that no set of circumstances exists under which the statute will be valid.'" *In re S.N.*, No. 14-07-00161-CV, 2009 WL 704724, *9 (Tex. App.—Houston [14th Dist.] Mar. 5, 2009, no pet.) (op. on reh'g) (quoting *Santikos v. State*, 836 S.W.2d 631, 633 (Tex. Crim. App. 1992) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In other words, the challenger must show the statute, by its terms, always operates unconstitutionally. *City of Corpus Christi v. Pub. Util. Comm'n,* 51 S.W.3d 231, 240-41 (Tex. 2001) (citing *Barshop,* 925 S.W.2d at 627).

Victor fails to demonstrate that under no set of circumstances could section 263.405(i) be valid. His assertion that "it is *practically* impossible" for an appellant to obtain and review the record, and then "formulate and file in writing all appellate issues" that might be raised is insufficient. (emphasis added) Here, Victor timely filed a statement of appellate points listing numerous grounds for appeal, and the only one not included – ineffective assistance of counsel – may be raised even if not included in a timely statement of appellate points. *See J.O.A.*, 283 S.W.3d at 339. If any alleged trial court error occurred after the due date for the statement of appellate points, the appellant would not be required to include it. *S.N.*, 2009 WL 704724, *9. Moreover, Victor does not contend there are issues he was precluded from raising because of the time restrictions in section 263.405(i). Accordingly, we find his facial challenge without merit.

A claim that a statute is unconstitutional "as applied" is a claim the statute, although generally constitutional, operates unconstitutionally as to the claimant because of his particular circumstances. *Texas Boll Weevil Eradication Found. v. Lewellen,* 952 S.W.2d 454, 461 n. 5 (Tex. 1997). In an "as applied" challenge, the challenger is only required to demonstrate the statute operates unconstitutionally when applied to his particular circumstances. *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.3d 504, 518 n.15 (Tex. 1995); *In re N.C.M.*, 271 S.W.3d 327, 328-29 (Tex. App.—San Antonio 2009, no pet.). Victor has not identified any appellate issue he was prevented from pursuing because of the restrictions of section 263.405(i). Where an appellate court has determined section 263.405(i) is unconstitutional as applied, the appealing parents identified specific complaints they were prevented from raising, and in response the court proceeded to address the issues the parents were precluded from raising. *See In re M.C.T.*, 250 S.W.3d 161, 172-73 (Tex. App.—Fort Worth 2008, no pet.). Here, we have addressed all of the complaints raised in Victor's

brief, and he has not alleged there were other complaints he would have raised but for the restrictions of section 263.405(i).  Accordingly, he has not demonstrated section 263.405(i) operated to deprive him of any rights.

Having determined Victor failed to demonstrate section 263.405(i) was facially unconstitutional or unconstitutional as applied to his circumstances, we overrule his fourth issue.

## CONCLUSION

We overrule all of the issues presented by Maricruz and Victor, and affirm the trial court's judgment terminating their parental rights to their children.

Steven C. Hilbig, Justice